NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0210n.06
No. 15-1060

**FILED**
Apr 10, 2017
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CHRISTOPHER LAJUAN TIBBS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: KETHLEDGE, WHITE, and DAVIS,[*] Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** A jury convicted defendant-appellant Christopher Tibbs of aiding and abetting Hobbs Act robbery and aiding and abetting possession of a firearm in furtherance of a crime of violence. The district court imposed a within-Guidelines sentence totaling 346 months of imprisonment. Tibbs appeals, challenging the district court's application of a career-offender enhancement under the Guidelines, and in a pro se supplemental brief, further argues that Hobbs Act robbery is not a § 924(c) crime of violence, the evidence is insufficient to support his convictions, and that his sentence is unreasonable. We **AFFIRM**.

### I. Background

This case arises out of the robbery of a Little Caesars restaurant in Redford Township, Michigan, by members or recruits of the Vice Lords, a street gang active across the Midwest.

---

[*]The Honorable Andre M. Davis, Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

The Government's theory is that Tibbs, known as "K" or "Fatah," was a leader of the gang's Michigan branch, the Mafia Insane Vice Lords; that Tibbs met with four Vice Lords members and prospects—Davone "Gudda" Baker, Clinton "Money" Edwards, Delaino "Jamaica" Eppenger, and Marlin "Ill Will" Smith—to discuss robbing the Little Caesars; that Tibbs gave the four advice, and the next morning, Baker, Edwards, and Smith executed the robbery while Eppenger stood watch nearby; and that the robbers then met with Tibbs to celebrate and get tattoos, and gave him a large portion of the money, which Tibbs used to pay for the group to attend a Vice Lords reunion in Chicago.

A grand-jury indictment charged Tibbs with aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. §§ 2 and 1951(a), and aiding and abetting possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c), as well as a street-gang enhancement, 18 U.S.C. § 521. At the four-day jury trial, the Government focused on establishing Tibbs's involvement in the planning of the robbery, relying mainly on the testimony of the other Vice Lords. The Government cast the robbery as a gang initiation orchestrated by Tibbs to finance the gang. The Vice Lords witnesses testified that, among other things, Tibbs told the crew that they would need weapons, face masks, and gloves; that they would need to do something about the cameras; and that they should make sure to leave no evidence.

The jury returned a verdict of guilty on both counts, and additionally found that Tibbs had aided and abetted brandishing (as opposed to simple possession), and that he committed one of the offenses while participating in a street gang. The Presentence Report (PSR) calculated a career-offender-enhanced Guidelines sentencing range of 262 to 327 months of imprisonment for the robbery, and a mandatory-minimum 84-month consecutive sentence for the firearm offense.

Tibbs filed a sentencing memorandum that requested a variance but did not object to the calculation of the Guidelines range in the PSR.

At sentencing, the district court adopted the PSR Guidelines range without objection. After denying Tibbs's request for a variance, the district court imposed a sentence of 346 months of imprisonment, consisting of 262 months' imprisonment for the robbery offense (the bottom of the Guidelines range) and 84 months' consecutive imprisonment for the firearm offense (the statutory mandatory minimum).

## II. The Guidelines Career-offender Enhancement

Tibbs first asserts that the district court erred in sentencing him as a career offender under the Guidelines. The Guidelines provide for an increased sentence if the defendant is a career offender. U.S.S.G. § 4B1.1(a) explains:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Tibbs argues that one of his two prior felony convictions—Michigan armed robbery, Mich. Comp. Laws § 750.529—is not a crime of violence. Additionally, Tibbs, in a supplemental brief, argues that his other prior felony conviction—Michigan delivery/manufacture of a controlled substance of less than 50 grams, Mich. Comp. Laws § 333.7401—is not a proper career-offender predicate because the Michigan statute is overbroad.

At the time of Tibbs's conviction and sentencing, the crime-of-violence Guideline provided:

> (a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
>> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). The commentary to this section, captioned "Application Notes," stated:

> "Crime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as 'crimes of violence' if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another.

The definition of crime violence is comprised of three clauses: the force clause, the enumerated-offense clause, and the residual clause. *See, e.g.*, *United States v. Rodriguez*, 664 F.3d 1032, 1036 (6th Cir. 2011). Physical force means violent force—that is, force capable of causing physical pain or injury to another. *Johnson v. United States*, 130 S. Ct. 1285, 1270-72, (2010)

In *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Supreme Court held the residual clause of the Armed Career Criminal Act of 1984 (ACCA) void for vagueness. In *United States v. Pawlak*, 822 F.3d 902, 904–11 (6th Cir. 2016), we held that *Johnson*'s reasoning invalidated U.S.S.G. § 4B1.2(a)'s identically worded residual clause. The invalidation of the residual clause prompted a new wave of litigation focusing on the force-as-an-element clause of the definition and on the commentary's application notes. Such was the law when Tibbs filed his appeal. However, the Supreme Court recently rejected a vagueness challenge to U.S.S.G. § 4B1.2(a)'s residual clause, concluding that the Guidelines, unlike the ACCA, do not fix the permissible range of sentences and "merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." *Beckles v. United States*, No. 15-8544,

2017 WL 855781, at *6 (U.S. Mar. 6, 2017). [1]  Thus, we analyze Tibbs's claim under the Guideline as it existed at the time of his sentencing, giving effect to the residual clause.

### A. Standard of review

The parties disagree regarding the proper standard of review.  Tibbs contends that ordinary, de novo review applies, *Rodriguez*, 664 F.3d at 1035; the government argues that because Tibbs conceded the issue below and challenges the enhancement for the first time on appeal, our review is for plain error.[2]  Tibbs responds that plain-error review does not apply because the district court did not adequately follow *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004); the government contends that the *Bostic* question was adequate.  We need not further address the standard of review because Tibbs' claim fails even de novo review.

---

[1]Effective August 1, 2016, the Sentencing Commission amended § 4B1.2(a)(2) to remove the residual clause and alter the list of enumerated offenses. *See* U.S.S.G. app. C, amendment 798; 81 Fed. Reg. 4741-02 (Jan. 27, 2016). The Guideline now provides:

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year that—

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. 5845(a) or explosive material as defined in 18 U.S.C. 841(c).

U.S.S.G. § 4B1.2.

[2] The government does not assert that Tibbs waived the claim by conceding the issue at sentencing.

## B. Michigan Armed Robbery

Tibbs contends that Michigan armed robbery is not a crime of violence.[3] At the time of his 1994 conviction, Michigan's armed robbery statute provided:

> Any person who shall assault another, and shall feloniously rob, steal and take from his person, or in his presence, any money or other property, which may be the subject of larceny, such robber being armed with a dangerous weapon, or any article used or fashioned in a manner to lead the person so assaulted to reasonably believe it to be a dangerous weapon, shall be guilty of a felony, punishable by imprisonment in the state prison for life or any term of years. If an aggravated assault or serious injury is inflicted by any person while committing an armed robbery as defined in this section, the sentence shall be not less than 2 years' imprisonment in the state prison.

Mich. Comp. Laws § 750.529 (1994), *amended by* 2004 Pub. Acts No. 128. This 1994 version of the armed robbery statute has three elements: "(1) an assault, (2) a felonious taking of property from the victim's person or presence, and (3) the defendant must be armed with a weapon described in the statute." *People v. Hendricks*, 503 N.W.2d 689, 691 (Mich. Ct. App. 1993), *aff'd*, 521 N.W.2d 546, 553 (Mich. 1994); *accord People v. Rodgers*, 645 N.W.2d 294, 298 (Mich. Ct. App. 2001); *People v. Norris*, 600 N.W.2d 658, 660 (Mich. Ct. App. 1999); *People v. Carines*, 597 N.W.2d 130, 135 (Mich. Ct. App. 1999); *People v. Johnson*, 547 N.W.2d 65, 71 (Mich. Ct. App. 1996); *People v. Allen*, 505 N.W.2d 869, 871 (Mich. Ct. App. 1993).

---

[3] Tibbs's challenge to the use of Hobbs Act robbery as a predicate for his § 924(c) conviction, raised in a pro se supplemental brief and discussed *infra*, contains unexplained citations to the analogous definition of "crime of violence" used in the career-offender Guideline, U.S.S.G. § 4B1.2(a)(2). Beyond these citations, Tibbs does not address the use of Hobbs Act robbery as the conviction offense for his career-offender enhancement, and the section of his brief addressing this issue expressly challenges his § 924(c) conviction, not his sentence. Tibbs Supp. Br. 13–15. If Tibbs intends to challenge the use of Hobbs Act robbery as the conviction-offense predicate for the career-offender enhancement, that challenge is at best perfunctory and undeveloped, and for that reason must be deemed waived on appeal. *United States v. Crumpton*, 824 F.3d 593, 619 n.7 (6th Cir. 2016) ("Generally, '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").

We take a "categorical" approach to determining whether an offense is a crime of violence, "looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Taylor v. United States*, 495 U.S. 575, 600 (1990). But when the statute of conviction "comprises multiple, alternative versions of the crime" with "alternative elements," the statute is considered "divisible," and we take a "modified categorical approach." *Descamps v. United States*, 133 S. Ct. 2276, 2284–85 (2013); *United States v. Ford*, 560 F.3d 420, 421–22 (6th Cir. 2009). Here, the 1994 version of Michigan armed robbery is not divisible; the Michigan state courts have made clear that the statute provides for one offense with three elements. *See*, e.*g.*, *Hendricks*, 503 N.W.2d at 691. The statute establishes different factual means of establishing the elements—for example, property may be taken from the victim's person or presence, and a defendant may be armed with an actual weapon or an article fashioned and perceived to be a dangerous weapon—but the Supreme Court recently made clear that "alternative factual means" do not make a statute divisible. *Mathis v. United States*, 136 S. Ct. 2243, 2249, 2251–54 (2016).

Tibbs makes various arguments asserting that Michigan armed robbery does not have physical force or the threatened use of physical force as an element and thus does not satisfy the force clause of U.S.S.G. § 4B1.2(a). However, in light of *Beckles*, we need not parse the Michigan armed robbery statute to determine whether it satisfies the force-as-an-element clause because it qualifies as a crime of violence under the residual clause of U.S.S.G. § 4B1.2(a). The residual clause of the Guidelines broadens the definition of "crime of violence" to include crimes that "otherwise involve[] conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). This court has previously held that Michigan larceny from the person, which requires that property be taken from the possession of the victim or from within

the immediate presence or area of control of the victim, is "clearly the type of situation that could result in violence" and constitutes a crime of violence under the residual clause of the Guidelines. *United States v. Payne*, 163 F.3d 371, 375 (6th Cir. 1998). Like larceny from a person, the armed robbery statute at issue has as an element the taking of property from the victim's person or presence. It also requires that the offender be armed with an actual or perceived weapon, which only increases the risk of violence. Michigan armed robbery therefore fits within the residual clause of the Guidelines.

### C. Michigan Delivery/Manufacture

In the wake of *Beckles*, Tibbs sought leave to file a supplemental brief to add a new argument challenging the use of his prior drug offense as a career-offender predicate. Under the unusual circumstance that *Beckles* precluded most of Tibbs' arguments, we granted the motion.

The Guidelines career-offender enhancement requires at least two "prior felony convictions of either a crime of violence or a controlled substance offense." The Guidelines define "controlled substance offense" as "an offense . . . that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). At the time of his 2009 conviction, the Michigan statute read: "Except as authorized by this article, a person shall not manufacture, create, deliver or possess with intent to manufacture, create or deliver a controlled substance, a prescription form, or a counterfeit prescription form." Mich. Comp. Laws § 333.7401(1); *see also People v. Brown*, 755 N.W.2d 664, 672 (Mich. Ct. App. 2008).

In his supplemental brief, Tibbs argues that *Mathis*, 136 S.Ct at 2243, and *United States v. Hinkle*, 832 F.3d 569 (5th Cir. 2016), two cases decided during the pendency of his appeal,

should persuade this court that the Michigan controlled substance statute is too broad to qualify as a career-offender predicate offense. Specifically, Tibbs argues that the Michigan controlled substance statute is indivisible under *Mathis* and *Hinkle*, and the inclusion of the terms "create," "a prescription form," and "a counterfeit prescription form" in the Michigan statute renders it overbroad in relation to the Guidelines definition of a controlled substance offense. In *Hinkle*, the Fifth Circuit held that a Texas statute that criminalized the act of offering to sell a controlled substance by including it in the definition of "deliver" was broader than the Guidelines' definition of a controlled-substance offense. 832 F.3d at 576. The court reasoned that the relevant portion of the statute was indivisible because the definition of "deliver" set out various means of committing the singular offense of "delivering a controlled substance," rather than distinct elements of separate offenses. *Id.* at 573 (alterations omitted). The Fifth Circuit thus found that in light of *Mathis*, the "delivery element of Hinkle's crime of conviction criminalizes a greater swath of conduct than the elements of the relevant Guidelines offense . . . [and] cannot serve as a predicate offense under the Career Offender Guideline provision[.]" *Id.* at 576–77 (internal quotation marks and alterations omitted).

However, Tibbs' reliance on *Mathis* and *Hinkle* is misplaced. First, in applying the elements/means distinction to the specific criminal statutes, *Mathis* applied established Iowa law and *Hinkle* applied established Texas law. *See State v. Duncan*, 312 N.W.2d 519, 523 (Iowa 1981) (holding that Iowa's burglary statute listed alternative means of satisfying the single locational element such that a jury need not agree on which location was involved in the offense); *Lopez v. State*, 108 S.W.3d 293, 299 (Tex. Crim. App. 2003) (holding that offering to sell a controlled substance is one means of satisfying the delivery element of the Texas controlled substance statute). Tibbs cites no Michigan law declaring that the relevant portions of

M.C.L. § 333.7401 provide alternative means rather than elements. Second, *Hinkle* addressed only the word "deliver" and its definition; it did not discuss the full text of the predicate-offense statute, which states that a person commits the offense "if the person knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance listed" in the penalty group. 832 F.3d at 572. *Hinkle* held only that the element of delivery was indivisible, and did not address whether the entire statute was indivisible such that manufacture, delivery, and possession with intent to deliver stated alternative means of satisfying a single element. *Id.* at 576. The latter, unaddressed inquiry is at issue here.

Further, although there is no Michigan case addressing the meaning of "create," in context it is likely that the word is included in the statute in addition to "manufacture" because it refers to the objects "a prescription form" and "a counterfeit prescription form." Additionally, it appears that in Michigan, defendants are generally charged with a particular form of the various offenses listed in the statute—manufacture, creation, or delivery or possession with intent to manufacture, create, or deliver a controlled substance, a prescription form, or a counterfeit prescription—and the act they are charged with becomes an element of the offense. *See, e.g., People v. Linton*, 2016 WL 7333422, at *2 (Mich. Ct. App. Dec. 15, 2016) (explaining the elements of manufacturing methamphetamine as including "the defendant manufactured a controlled substance" and the elements of delivering methamphetamine as including "the defendant delivered a controlled substance."). The same is true of "prescription form[] or counterfeit prescription form." *See, e.g., United States v. Solomon*, 592 Fed. App'x 359, 361 (6th Cir. 2014) (referring to prescription form as an element of the statute). *See also Linton*, 2016 WL 7333422, at *2 (defining the elements of manufacturing methamphetamine as including "the defendant manufactured a controlled substance"); *People v. Mass*, 628 N.W.2d

540, 625 (Mich. 2001) ("It is even more evident that subsection (2) of M.C.L. § 333.7401 entails the elements of separate offenses because subsection (2) covers various drug types as well as prescription forms. [T]hese textual clues support the conclusion that the amount and *nature* of controlled substances are elements of a delivery offense[.]") (emphasis in original); *People v. Wolfe*, 489 N.W.2d 748, 752 (Mich. 1992), *amended* (Oct. 9, 1992) (defining the elements of possession with intent to deliver less than fifty grams of cocaine as including "that the recovered substance is cocaine").

Moreover, unlike the criminal statutes in *Mathis* and *Hinkle*, M.C.L. § 333.7401's subsections provide different penalties for the various offenses described. Violations of the statute involving a prescription form or a counterfeit prescription form are punishable by imprisonment for not more than 7 years or a fine of not more than $5,000 or both. M.C.L. § 333.7401(2)(f). In contrast, violations involving delivery/manufacture are subject to a much greater penalty. M.C.L. § 333.7401(2)(a)(i)–(iv). This is further indication that the statute set forth separate offenses and not alternative means of committing the same offense.

We note, finally, that although the PSIR describes the 2009 conviction offense as "Deliver/Manufacture Controlled Substance (Cocaine) Less Than 50 Grams," because Tibbs conceded the predicate-offense issue below, we have no *Shepard* documents to conclusively establish the predicate conviction offense. In his opening brief on appeal, Tibbs asserts that he was actually convicted of simple use, not delivery/manufacture, although he concedes there is no support for that assertion in the instant record and such a claim "should be raised in the district court on a motion under 28 U.S.C. § 2255." Appellant Br. at 9. Thus, on this record we find no error in the district court's use of the 2009 conviction to support application of the career-offender enhancement.

**Convictions**

Tibbs raises several additional issues in his pro se supplemental brief. He first challenges his convictions, arguing that Hobbs Act robbery is not a crime of violence under § 924(c) and that the evidence does not support his convictions.

**A. Crime of violence**

Section 924(c) prohibits using or carrying a firearm "during and in relation to any crime of violence." Tibbs contends that Hobbs Act robbery is not a "crime of violence." Tibbs forfeited this objection by failing to raise the issue in the district court, and we review only for plain error. *United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013). "We may consider relief for an error not raised below only if we find (1) error, (2) that is 'plain,' and (3) that affects the substantial rights of the defendant." *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)). "If these three conditions are met, then we may exercise our discretion to notice the forfeited error, but only if we find the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

> Section 924(c) provides:
>
> For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). As with the career offender enhancement, "we use a 'categorical approach' to determine whether an offense constitutes a 'crime of violence' for purposes of § 924(c)(3)," *United States v. Rafidi*, No. 15-4095, 2016 WL 3670273, at *4 (6th Cir. July 11, 2015), "looking only to the statutory definitions of the prior offenses, and not to the particular

-12-

facts underlying those convictions." *Taylor,* 495 U.S. at 600. But when the statute of conviction "comprises multiple, alternative versions of the crime" with "alternative elements," the statute is considered "divisible," and we take a "modified categorical approach." *Descamps*, 133 S. Ct. at 2284–85. Under this approach, we must "determine which statutory phrase was the basis for the conviction" by examining a limited class of trial-court materials. *Johnson v. United States*, 559 U.S. 133, 144 (2010).

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Here, there seems to be no dispute that the Hobbs Act is divisible into distinct robbery and extortion offenses, and that Tibbs was convicted of robbery. *Cf. United States v. Hill*, No. 14-3872, 2016 WL 4120667, at *3 n.5 (2d Cir. Aug. 3, 2016); *United States v. Kennedy*, 133 F.3d 53, 57 (D.C. Cir. 1998); *United States v. Mendez*, 992 F.2d 1488, 1491 (9th Cir. 1993). Because the parties agree, we assume without deciding that this division of the statute is correct.

Although we apparently have not yet addressed the question whether aiding and abetting Hobbs Act robbery is a crime of violence, we held in *United States v. Taylor*, 176 F.3d 331 (6th Cir. 1999), that conspiracy to commit Hobbs Act robbery is a crime of violence under § 924(c)(3)'s residual clause. *Id.* at 337–38; *see also, e.g.*, *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996) (per curiam); *Mendez*, 992 F.2d at 1491. Further, we declined to extend the Supreme Court's *Johnson* void-for-vagueness analysis to the similarly, but not identically, worded residual clause of § 924(e), and instead upheld the residual clause. *United States v.*

*Taylor*, 814 F.3d 340, 379 (6th Cir. 2016). *But see Shuti v. Lynch*, No. 15-3835, 2016 WL 3632539, at *9 (6th Cir. 2016) (holding the residual clause of 18 U.S.C. § 16(b) void for vagueness). The Eleventh Circuit recently held that aiding and abetting Hobbs Act robbery is a crime of violence under § 924(c)(3)(A), the force clause. *In re Colon*, No. 16-13021, 2016 WL 3461009, at *4 (11th Cir. June 24, 2016). The Second and Ninth Circuits have also concluded that Hobbs Act robbery satisfies the force clause more generally. *Hill*, 2016 WL 4120667, at *7; *United States v. Howard*, No. 15-10042, 2016 WL 2961978 (9th Cir. May 23, 2016) (mem.); *see also United States v. Farmer*, 73 F.3d 836, 842 (8th Cir. 1996) (concluding that Hobbs Act robbery satisfies the force clause of 18 U.S.C. § 3559(c)(2)).

Tibbs does not point to cases supporting his argument that aiding and abetting Hobbs Act robbery is not a crime of violence, and we have found none. Under these circumstances, any error is not sufficiently plain to warrant reversal on the basis of a forfeited objection. *United States v. Olano*, 507 U.S. 725, 734 (1993) (defining "plain" as "synonymous with 'clear' or, equivalently, 'obvious'").

## B. Sufficiency of the evidence

"Evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' when '*all of the evidence* is . . . considered.'" *United States v. Honeycutt*, 816 F.3d 362, 670 (6th Cir. 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In undertaking this analysis, this court neither independently weighs the evidence nor judges the credibility of witnesses who testified at trial." *United States v. Napier*, 7 F.3d 333, 345 (6th Cir. 2015) (quoting *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010)) (internal quotation marks omitted).

## 1. Aiding and abetting Hobbs Act robbery

Tibbs first contends there was insufficient evidence to support that he aided and abetted the Hobbs Act robbery committed by Baker, Edwards, Eppenger, and Smith. In proscribing aiding and abetting under 18 U.S.C. § 2,[4] Congress used language that "comprehends all assistance rendered by words, acts, encouragement, support, or presence," *Reves v. Ernst & Young,* 507 U.S. 170, 178 (1993), even if that aid relates to only one (or some) of a crime's phases or elements. However, "a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). Tibbs does not contest the first prong of this analysis, but argues only that the government offered insufficient evidence of his intent to facilitate the robbery.

A rational jury could find that Tibbs intended to facilitate the robbery. At trial, the government presented evidence that Tibbs was present when the Vice Lords were planning the robbery, provided advice on how to commit the offense, and used some of the proceeds to pay for the principals' tattoos and a Vice Lords meeting in Chicago.

For example, Smith testified that Tibbs was present during the planning, and told the robbers, "[I]f y'all was going to do it, make sure y'all do it right." R. 49, Tr., PID 403. The government read to Smith from his grand-jury testimony, where the government had asked whether Baker called Tibbs "to make sure he would approve of the robbery or bless the

---

[4] 18 U.S.C. § 2 provides:
    (a) Whoever commits an offense against the United States or aids, abets, counsels commands, induces or procures its commission is punishable as a principal.
    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

robbery," and Smith had answered, "Bless the robbery, yeah." *Id.* at PID 404. Smith confirmed that he recalled his answer. During the grand-jury proceedings, the government had also asked Smith why the robbers called Tibbs, and why the call was important; Smith had responded, "Because he's the chief enforcer. Before they do anything they have to go through him." *Id.* at PID 405. Smith again confirmed that he recalled this answer. Smith also testified that Tibbs had told the robbers to make sure not to leave evidence.

The government asked Smith whether Tibbs had mentioned "bringing money into the nation" with respect to the robbery. *Id.* at PID 406. Smith responded, "No," and the government again referred to the grand-jury proceedings, where Smith had testified: "[Tibbs] said when you get done with the job half of it goes to y'all, half of it goes to the whole crew just in case something like this would happen." *Id.* at PID 407–08. Smith testified that he recalled providing this testimony, and the government asked whether "something like this" had been a reference to "[g]etting caught." *Id.* at PID 408. Smith answered that he had meant "[s]omething like if we needed to use for then we'll be able to have it to use it [sic]." *Id.* at PID 408. The government asked what they would "use it" for, and Smith responded: "Probably drugs." *Id.* The government also asked who supplied the walkie-talkies used in the robbery, and Smith responded, "To be honest, I don't know." *Id.* at PID 416–17. The government then read from the grand-jury testimony, where Smith had testified that Tibbs provided the walkie-talkies, and Smith testified that he recalled this answer.

Similarly, Edwards testified that Tibbs "said we was going to need weapons." R. 49, Tr., PID 354–55. The government asked whether Tibbs told the robbers that they would need weapons, face masks, and gloves; Edwards testified that he had. The government asked whether Tibbs said "anything about cameras," and Edwards answered, "Yeah." *Id.* Edwards also

testified that the robbers communicated by walkie-talkie because they "didn't trust the phone" which "could be tapped." *Id.* at PID 357–58. After Edwards testified that Eppenger had provided the walkie-talkies, the government read from Edwards's grand-jury testimony, where he testified that Tibbs provided them, and Edwards denied his grand-jury testimony. Later, the government asked Edwards: "Did you know that the walkie-talkies were from [Tibbs]?" *Id.* at PID 377. Edwards answered: "No." *Id.*

During Baker's testimony, the government focused on the planning for the robbery. Baker testified that he "remember[ed] putting the plan together the night before, before we executed the next day," but didn't remember whether Tibbs was present. R. 50, Tr., PID 509–11. The government reminded Baker of the grand-jury proceedings, where he had been asked whether the robbers brought the plan to Tibbs, and Baker had testified: "We did put the plan to him, and he put his thoughts in." *Id.* When asked what Tibbs said, Baker had testified: "Pretty much how to execute it. What to do, what not to do. What to wear, what not to wear, you know. . . . Wear gloves. . . . Get the money so we can come back to the way we was." *Id.* Baker repeatedly testified that he did not remember his testimony from the grand jury: "I seen the paper, man, but I don't remember that." *Id.* The government also asked Baker about the financial motive for the robbery, and whether the robbers had been "fund raising for the gang." *Id.* at PID 514–16. Baker answered: "No, but that's what the money went to." *Id.*

On redirect, the government returned to the issue of planning, and Baker testified that Tibbs "definitely did not help plan the robbery." *Id.* at PID 532–34. The government reminded Baker of his grand-jury testimony, and Baker responded:

> Right. So Mr. Prosecutor, now if that is called planning a robbery then by all means, yes. I thought planning a robbery is when you sit down and put together the plan with the people that's going to help you do it meaning as me, and the three guys that went in and did the robbery sat down and discussed specifically

what we were going to do as partners, as us working together. I was the gunman. The two were the eyes and the lookout and to make sure I wasn't rushed, and to disabled phones and cameras [sic]. That is planning. What you just described was basically putting in input. That's not planning. That's putting an input in. Come on, man.

*Id.* The government asked, "So your gang leader put in just input," and Baker answered, "Basically." *Id.*

Lastly, the government's brief on appeal emphasizes evidence that Tibbs had access to long-range walkie-talkies. During the testimony of an investigating police officer, the government introduced paperwork that had been recovered from the house where the Vice Lords gathered to plan the robbery. The paperwork described the Vice Lords' organizational structure and rules, including the maintenance of walkie-talkies for security, and records indicated that certain members in the gang must have two-way long-range walkie-talkies, with prices from different stores included. Police also testified to paperwork recovered from Tibbs's bedroom in a different house, which included gang-related paperwork and a document noting the purchase of two walkie-talkies for $16.

Tibbs argues that the evidence of his intent to facilitate the robbery is too circumstantial. However, "juries may consider circumstantial evidence and draw reasonable inferences from such evidence." *United States v. Washington*, 715 F.3d 976, 980 (6th Cir. 2013). The testimony was sufficient to support the reasonable inference that Tibbs aided and abetted the robbery by providing assistance with the requisite intent.

### 2. Aiding and abetting possession of a firearm

Next, Tibbs challenges the evidence to support that he aided and abetted the brandishing of a firearm during the robbery. Where a defendant is charged with aiding and abetting a § 924(c) firearm offense, "the government makes its case by proving that the defendant actively

participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission." *Rosemond*, 134 S. Ct. at 1243. Here, the jury specifically found that Tibbs aided and abetted "brandishing," which has a higher mandatory minimum than carrying. 18 U.S.C. § 924(c)(1)(A)(ii).

A rational jury could find that Tibbs actively participated in the robbery by giving advice and assistance with planning, and that he not only had advance knowledge that Baker would brandish a firearm, but he also made sure that he was prepared to do so if necessary. At trial, the government adduced testimony from Edwards and Smith that Tibbs advised them to bring a gun. The government asked Edwards: "Did he tell you, you were going to need weapons?" R. 49, Tr., PID 354. Edwards answered: "Well, he said—well, yeah, he said we was going to need weapons." *Id.* The government later confirmed: "You testified that [Tibbs] told you before the robbery that you needed weapons; correct?" *Id.* at PID 377. Edwards answered: "Correct." *Id.* The government then asked Smith: "But he knew the gun would be used. He asked, right, if anyone had a gun?" *Id.* at PID 410–11. Smith answered: "Yes." *Id.* at PID 411.

The government also read grand jury testimony from Smith and Baker to refresh their memories. During the grand jury proceedings, the prosecutor had asked Smith: "What did [Tibbs] know about whether the gun would be used or not?" R. 49, Tr., PID 410. Smith had answered: "Because he knew Baker had the gun, so he wanted us to take it just in case if it wasn't two girls, and if it was just one guy and one girl." *Id.* The government had asked: "And the gun could be used to make sure your demands were met?" *Id.* Smith had responded: "Make sure the job was finish." *Id.* When the government read this testimony at trial, Smith said: "Yes, I recall that, but that's not true." *Id.* Before the grand jury, Smith had also said: "He told

-19-

[Baker] to go get his gun that he had, that he knew he had." *Id.* at PID 438. At trial, the government asked: "Did you say that in front of the jury?" *Id.* Smith answered: "Yes." *Id.*

Baker initially testified at trial that he didn't "really remember" whether Tibbs knew a gun would be used. R. 50, Tr., PID 517. The government then read a question from the grand jury proceedings: "But he, meaning Christopher Tibbs, knew a gun was going to be involved. And, in fact, advised you to use a gun." *Id.* at PID 519. Baker had responded: "Yes, sir." *Id.* Asked at trial whether he recalled that testimony, Baker said: "I remember something like that. Yeah, I remember something like that." *Id.* Before the grand jury, Baker had also testified: "[H]e knew a gun was going to be used." *Id.* at PID 533. When the government read this testimony at trial, Baker answered: "Right," although he proceeded to explain his view that Tibbs "was basically putting in input." *Id.*

Tibbs has not shown that no rational trier of fact "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

### III. Sentence

Tibbs also appeals his sentence, arguing that his sentence is substantively unreasonable.

### B. Substantive reasonableness

Tibbs argues that his within-Guidelines sentence was substantively unreasonable, an issue we review for an abuse of discretion. *United States v. Solano-Rosales*, 781 F.3d 345, 355–56 (6th Cir. 2015). A sentence is reasonable if it is "proportionate to the seriousness of the circumstances of the offense and the offender, and sufficient but not greater than necessary" to comply with 18 U.S.C. § 3553. *United States v. Robinson*, 778 F.3d 515, 519 (6th Cir. 2015). A sentence is unreasonable if the district court "selects a sentence arbitrarily, bases the sentence on impermissible factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Bass*, 785 F.3d 1043, 1052 (6th Cir. 2015). We will reverse only when "left

with the definite and firm conviction that the sentencing court committed a clear error of judgment." *United States v. Kerley*, 784 F.3d 327, 347 (6th Cir. 2015).

Tibbs argues that the district court did not adequately consider the § 3553 factors or explain its reasoning, particularly with respect to the nature and circumstances of the offense. At sentencing, the district court first explained why it would not depart from the Guidelines range:

> I think [the Guidelines] are consistent with the factors in 3553 which I'm going to go over also in this particular matter. I think they're consistent also with fairness and I understand the disparity argument but the disparity argument also is disparity in conduct. The conduct of this defendant is not similar in most ways to the others [*i.e.*, the principals in the robbery]. So, therefore, any disparity of the sentence is I think covered by the sentencing guidelines very, very adequately and 3553. So the Court is going to follow the sentencing guidelines in this particular matter.

R. 47, Tr., PID 233. The district court emphasized that it would "normally start with the sentencing guidelines and finish somewhere else," but "in this particular case" the Guidelines range was "appropriate." *Id.*

The district court then explained:

> The Court has considered the factors in 3553 also. I think the circumstances as I've just indicated of this particular case and this particular defendant. I think the need for—imposition of his sentence that will deter not only this defendant but others, especially others in this arena, this kind of arena, that was happening here. I think to protect the public is an important consideration. I think the thing that probably is the most troubling is I want to fashion a sentence that is both fair but not overly unfair or not overly harsh in this particular matter. I think by using the guidelines that kind of sentence is the kind of sentence that would be appropriate in this particular matter.

*Id.* at PID 234. The district court could have explained its reasoning to Tibbs more clearly and in greater detail, especially given the length of the sentence. However, Tibbs has not rebutted the "presumption of reasonableness" that attaches to a sentence at the bottom of the Guidelines range. *United States v. Odeh*, 815 F.3d 968, 984 (6th Cir. 2016).

## IV. Conclusion

For these reasons, we **AFFIRM** Tibbs's conviction and sentence.