# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1225

_____

United States of America

*Plaintiff - Appellee*

v.

Randy Jason Ford

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: October 19, 2017
Filed: April 25, 2018

_____

Before GRUENDER and BENTON, Circuit Judges, and TUNHEIM,[1] Chief
District Judge.

_____

TUNHEIM, Chief District Judge.

Defendant-Appellant Randy Ford was arrested for being a felon in possession
of a firearm. Ford moved to suppress evidence of the handgun at issue and his related

---

[1]The Honorable John R. Tunheim, Chief United States District Judge for the
District of Minnesota, sitting by designation.

incriminating statements. After an evidentiary hearing, the trial court[2] denied his motion. Ford pled guilty, and the trial court sentenced him to a mandatory minimum sentence of 180 months under the Armed Career Criminal Act. This appeal follows.[3]

## I.

On January 19, 2016, Iowa Department of Corrections ("DOC") Officer Mike Evans received a tip that Defendant-Appellant Randy Ford was staying at a particular Des Moines residence owned by a woman named Dawn. Evans was part of a DOC fugitive unit tasked with locating and arresting parole violators. The unit had an arrest warrant for Ford. Evans was told that Ford used a cell phone in the southeast bedroom window as a surveillance device when he was present in the residence. Evans was also told that Ford had recently been seen with a handgun, and that he may be suicidal. The DOC officers had not met the tipper before that day, but an officer verified that the home at that address was owned by a woman named Dawn. And, when four or five DOC officers and two U.S. Marshals went to the residence, they saw a cell phone in the window of the southeast bedroom.

As the officers approached the house, they encountered a woman outside. The nature of that interaction is a matter of dispute. DOC Officer Smith testified that the woman indicated that Ford was inside the home, either verbally or through a gesture. The woman testified that she told officers that she did not know whether Ford was inside. The trial court noted that the woman had known Ford for about a month and, like Ford, was on parole. It concluded that "[t]he court does not believe her" testimony. Ford argues that no credible fact finder could reach that conclusion.

---

[2]The Honorable John A. Jarvey, Chief United States District Judge for the Southern District of Iowa.

[3]Although we exercised our discretion to grant Ford leave to file a pro se supplemental brief, we denied him leave to file a reply. Ford subsequently filed a motion for reconsideration of the latter decision, which we now deny.

Ford also disputes the trial court's conclusion that DOC Officer Kness "observed a hand in the window of the southeast bedroom before entering the residence." Ford insists that such an observation would have been impossible because the bedroom windows were covered by curtains glued tightly to the walls. He notes that several video recordings of the curtains made by the homeowner were received into evidence at the suppression hearing. Ford also says that the bed was located in front of the window, blocking anyone from walking up to it.

It is undisputed that officers entered the house without knocking or forcing entry and split up to look for Ford. The trial court found that officers methodically "cleared" each room. When Evans arrived in the southeast bedroom, he moved the bed from the wall and checked the closet for Ford. At the same time, another officer found Ford hiding in the closet of the southwest bedroom. Evans assisted with his arrest, then returned to the southeast bedroom. There, he saw a handgun in plain view. After Ford was given *Miranda* warnings, he admitted that the gun was his and that he had thrown it under the bed when he saw police approaching the residence.

## II.

Ford argues that his Fourth Amendment rights were violated by the officers' entry into the home without a search warrant and by the scope of their protective sweep incident to his arrest. As a result, Ford says, evidence of the handgun and his statements should have been suppressed. "A mixed standard of review applies to the denial of a motion to suppress evidence." *United States v. Smith*, 820 F.3d 356, 359 (8th Cir. 2016) (citing *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015)). The trial court's findings of fact are reviewed for clear error and its denial of the suppression motion is reviewed de novo. *Id.*

We must determine as a preliminary matter whether Ford waived his right to advance his argument about the scope of the protective sweep by failing to assert it below. Waiver is "'the intentional relinquishment or abandonment of a known right,' whereas forfeiture is 'the failure to make the timely assertion of a right.'" *United*

*States v. Chavarria-Ortiz*, 828 F.3d 668, 670-71 (8th Cir. 2016) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).[4] The former precludes review altogether, while the latter requires a plain-error standard of review. *Id.* at 671. We conclude that Ford did not intend to waive this issue, and apply a Rule 52(b) plain-error standard of review. To prevail, Ford must show that there is "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three of those conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Miranda-Zarco*, 836 F.3d 899, 902 (8th Cir. 2016) (quoting *United States v. Ault*, 598 F.3d 1039, 1042 (8th Cir. 2010)) (internal quotation marks omitted).

Because there is no clear error in the trial court's findings of fact, no error in its conclusions of law as to the officers' entry into the home, and no plain error with regard to the scope of the protective sweep, we will affirm the decision below.

**A.**

Ford argues that his Fourth Amendment rights were violated by the officers' entry into the home without a search warrant.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason

---

[4]*Compare id.* (applying plain error review when defendant merely failed to object at sentencing to adequacy of trial court's explanation) *with United States v. Evenson*, 864 F.3d 981, 983 (8th Cir. 2017) (finding waiver when defendant raised and then withdrew objection at sentencing); *United States v. Harrison*, 393 F.3d 805, 808 (8th Cir. 2005) (finding waiver when judge identified an issue for counsel, who did not object); *United States v. Thompson*, 289 F.3d 524, 526 (8th Cir. 2002) (finding waiver when counsel withdrew all eight of his objections); *United States v. Murphy*, 248 F.3d 777, 779 (8th Cir. 2001) (finding waiver when counsel asked for a sentence at low end of the sentencing guidelines rather than a departure).

to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). When a suspect is a "co-resident" of a third party's home, an arrest warrant for the suspect may allow entry into the home. *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996). For entry to be valid, officers must have both (1) a reasonable belief that the suspect resides at the place to be entered and (2) reason to believe that the suspect is present at the time the warrant is executed. *Id.* "Whether the officers had reasonable belief is based upon the 'totality of the circumstances' known to the officers prior to entry." *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (quoting *United States v. Junkman*, 160 F.3d 1191, 1193 (8th Cir. 1998)).

In *Glover*, we held that it was reasonable for law enforcement officers to believe a suspect was a co-resident in a third party's home when they received an anonymous tip from a 9-1-1 caller that was "consistently accurate and detailed," including the suspect's date of birth and the building's entrance gate code. *Id.* at 373-74. While anonymous tips are treated with some mistrust, when "information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.* at 373 (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). The presence requirement was met by observing the suspect's car outside and by following up with the informant, who was able to accurately describe law enforcement activity outside the house – because, she said, she was talking with the suspect about how he was watching from inside. *Id.* at 374.

Likewise, in *United States v. Boyd*, we held that it was reasonable for law enforcement officers to believe a suspect was a co-resident in a third party's home when they were told by an informant that the suspect resided there and corroborated that tip with neighbors. 180 F.3d 967, 978 (8th Cir. 1999). The presence requirement was met by corroborating the informant's follow-up tip with the fact that the suspect's car was at the home when law enforcement arrived. *Id.*

-5-

Just as in *Glover* and *Boyd,* it was reasonable for law enforcement officers to believe that Ford was a co-resident of the home and present at the time the warrant was executed. The informant who provided the tip that Ford was staying in the home was untested, so there would be reason for mistrust absent corroboration. However, the officers corroborated not only that the home was owned by someone named Dawn, but also the much more specific fact that Ford placed his cell phone in the southeast bedroom window for use as a surveillance device when he was present.[5]

In addition, the trial court credited Smith's testimony that the woman outside the house stated or gestured that Ford was inside and Kness's testimony that he saw a hand moving the southeast bedroom window shade.[6] The trial court has a "distinct advantage" in evaluating witness credibility, and its credibility determinations are "virtually unreviewable on appeal." *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011) (quoting *United States v. Ralph*, 480 F.3d 888, 890 (8th Cir. 2007)) (internal quotation marks omitted). We find no clear error in these findings and no error in the trial court's conclusion of law.

**B.**

Ford argues for the first time on appeal that his Fourth Amendment rights were violated by the scope of the officers' protective sweep incident to his arrest.

The protective sweep doctrine allows officers to make a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Officers may

---

[5]Ford does not dispute that officers saw his cell phone, even though he argues that they could not have seen his hand because the curtains were glued to the walls.

[6]The trial court noted that this testimony was "of little moment as it simply confirmed that another person was in the residence." Together with the corroborated tip about the cell phone in the window and the woman's indication that Ford was inside, it reinforces the officers' reasonable belief that the person inside was Ford.

always "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," and may sweep beyond that if they have a reasonable belief, based on specific and articulable facts, that the area searched harbors a person posing a danger to officers or others. *Id.* at 334. During such a protective sweep, police may seize an item in plain view if its incriminating character is "immediately apparent." *Horton v. California*, 496 U.S. 128, 136 (1990).

Justification for a preventive sweep does not automatically end when a suspect is arrested. *See, e.g.*, *United States v. Alatorre*, 863 F.3d 810, 814-15 (8th Cir. 2017) (upholding post-arrest sweep when residents acted suspiciously when police knocked, suspect's girlfriend lingered out of sight until called to the door, and suspect had a violent criminal history involving concealed weapons); *United States v. Brown*, 217 F.3d 605, 607 (8th Cir. 2000) (upholding post-arrest sweep when suspect paused before denying that anyone else was present and police knew that he and his roommate had been armed during a prior arrest).

It was not plain error to hold that the protective sweep was justified here. First, officers had reason to believe that Ford was armed: they were told that Ford had recently been seen with a handgun and that he may be suicidal. Second, Evans pulled the bed from the wall during the initial search for Ford. The fact that Ford was found hiding in the closet of another room shows that it was reasonable for Evans to move furniture while trying to find him. Ford's gun was revealed to plain sight as a result. Although the gun was not actually discovered until after Ford's arrest, to the extent that the trial court credited Kness's testimony that he saw a hand in the southeast bedroom window, we cannot say that it was plainly unreasonable for Evans to have returned to Ford's bedroom immediately after the arrest.

## III.

Ford also argues for the first time on appeal that he should not have been sentenced as an Armed Career Criminal because his convictions for three burglaries, assault with a dangerous weapon, and two drug violations are not predicate offenses

under the Armed Career Criminal Act ("ACCA"). Although Ford did not raise an objection to his classification as an Armed Career Criminal at sentencing, he states that his attorney advised him that objecting would be useless because of his burglary convictions – even though his sentencing took place after the Supreme Court held in *Mathis v. United States* that convictions under Iowa's burglary law are not ACCA predicate offenses. 136 S. Ct. 2243, 2246 (2016). As such, we conclude that he did not intend to waive this issue, hold that his burglary convictions are not ACCA predicate offenses, and consider his assault and drug convictions under a plain-error standard of review.

The ACCA requires a 15-year mandatory minimum sentence for a defendant convicted of being a felon in possession of a firearm when they have previously been convicted of three serious drug offenses or violent felonies. 18 U.S.C. § 924(e)(1).

We look to the generic version of Ford's crimes to determine whether they are ACCA predicate offenses. *Taylor v. United States*, 495 U.S. 575, 598 (1990). If a statute "sweeps more broadly than the generic crime, a conviction under that law cannot count as an ACCA predicate." *Descamps v. United States*, 570 U.S. 254, 261 (2013). To determine whether Ford's crimes of conviction sweep more broadly than the generic offenses, we take the "categorical approach." *Id.* When a statute contains alternatives, our job is first to determine whether they are divisible elements or merely alternative means. *Mathis*, 136 S. Ct. at 2256. "Elements" must be proven to sustain a conviction, while "means" are "brute facts" that need not be found by a jury nor admitted by a defendant to convict. *Id.* at 2248. When we conclude that a statute's alternatives are divisible elements that define multiple crimes, we use the "modified categorical approach," examining certain documents from the record to determine the elements necessary for the defendant's conviction and compare them with the generic offense. *Id.* at 2249.

Because the elements of Ford's assault conviction include use of a dangerous weapon in connection with the assault, it is a violent felony. Because the alternative

types of controlled substances are elements defining multiple crimes, we use the modified categorical approach, revealing that Ford's two drug convictions were serious drug offenses. Because Ford has three predicate offenses, he is an Armed Career Criminal; as such, we will affirm his sentence.

**A.**

Under the ACCA, "violent felonies" include crimes that have "as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). "[T]he phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

Ford pled guilty to assault with a dangerous weapon on a peace officer under Iowa law. That crime contains three elements:

> A person who [1] commits an assault, as defined in section 708.1, against a peace officer . . . [2] who knows that the person against whom the assault is committed is a peace officer . . . and [3] who uses or displays a dangerous weapon in connection with the assault, is guilty of a class "D" felony.

Iowa Code § 708.3A(2).

The parties focus on the first element of the crime, which defines the assault by reference to another section of Iowa Code. But it is the third element that decides this issue. Iowa law defines a "dangerous weapon" as:

> [A]ny instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed . . . . Additionally, any instrument or device of any sort whatsoever which is actually used in such a manner as to indicate that the defendant intends to inflict death or

-9-

serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon.

Iowa Code § 702.7.

Displaying an instrument or device designed primarily for use in inflicting death or injury in connection with an assault is a violent felony. *See United States v. Pulliam*, 566 F.3d 784, 788 (8th Cir. 2009) (exhibiting a "weapon readily capable of lethal use in an angry or threatening manner" is a violent felony). And it is obvious that using an instrument or device in a manner that indicates intent to cause death or injury is a violent felony. Therefore, any conviction under Section 708.3A(2) necessarily requires violent force, rendering the crime a violent felony under the ACCA.

**B.**

Under the ACCA, "serious drug offenses" include state-law offenses "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). The Controlled Substances Act schedules "methamphetamine, including its salts, isomers, and salts of isomers" as a controlled substance. 21 U.S.C. § 812.

Ford pled guilty in 2002 to manufacturing methamphetamine and in 2011 to possession of methamphetamine with intent to deliver under Iowa law, which at the time of his guilty pleas made it illegal to "to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance, a counterfeit substance, or a simulated controlled substance." Iowa Code § 124.401(1) (2011); *id.* § 124.401(1) (2002). Both crimes are punishable by up to 25 years in prison. *Id.* § 902.9(1)(b).

Ford argues that the Iowa statute is categorically broader than the federal statute because it criminalizes simulated controlled substances, while the generic federal analog (21 U.S.C. § 841) covers only controlled and counterfeit substances. And, indeed, we have held that convictions for simulated controlled substances are not predicate offenses. *United States v. Brown*, 598 F.3d 1013, 1018 (8th Cir. 2010).

But these alternatives are elements, not means. The structure of the statute reveals that it is divisible because different drug types and quantities carry different punishments. *See Mathis*, 136 S. Ct. at 2256. The nature and quantity of the substance at issue are therefore essential to the crime's legal definition; they are not mere "brute facts."[7] Reference to Iowa state court cases confirms that the drug at issue is an element given in jury instructions, showing that it must be proven to sustain a conviction.[8] Therefore, we apply the modified categorical approach, revealing that Ford's convictions are serious drug offenses under the ACCA.

\* \* \*

For the foregoing reasons, we affirm the trial court's denial of Ford's motion to suppress evidence and its sentencing of Ford as an Armed Career Criminal.

———————————————————

[7] *See United States v. Tibbs*, 685 Fed. Appx. 456, 463 (6th Cir. 2017) (holding that a similar Michigan law is divisible); *United States v. Henderson*, 841 F.3d 623, 630-31 (3d Cir. 2016) (holding that a similar Pennsylvania law is divisible); *United States v. Ellis*, CR-13-257, 2017 WL 3972467, at \*3 (D. Minn. Sept. 7, 2017) (holding that a similar Illinois law is divisible); *cf. United States v. Hinkle*, 832 F.3d 569, 575-76 (5th Cir. 2016) (holding that a similar Texas law is not divisible in light of state court decisions holding that the method of delivering a controlled substance is not an element of the crime, but merely an alternative means).

[8] *See, e.g., State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) ("controlled substance" and "methamphetamine"); *State v. Fintel*, 689 N.W.2d 95, 100 (Iowa 2004) ("methamphetamine"); *State v. Henderson*, 478 N.W.2d 626, 629 (Iowa 1991) ("simulated controlled substance").